# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## BROWN v. COMMONWEALTH.

### JANUARY 16th, 1890.

1. CRIMINAL PROCEEDINGS—*Indictment—Murder.*—An indictment concluding "against the peace and dignity of the commonwealth *of Virginia,*" and designating the person to have been murdered by the initials of his name, though not signed by the commonwealth's attorney: *held*, sufficient.

2. IDEM—*Swearing jury.*—It is sufficient if the record recites that "the jury were sworn the truth of and upon the premises to speak."

3. IDEM—*Instructions—Fear of life and limb—Excusable homicide.*—Refusal to instruct that "if the jury believe from the evidence that the deceased did any act, or that circumstances were brought about by him of such a character as to afford the accused reasonable grounds for believing that deceased designed to kill him, or to inflict on him great bodily harm, and that there was imminent danger of carrying such design into immediate execution, then the killing is excusable, although it may have turned out that the appearances were deceptive and no such design existed": *held*, error.

4. IDEM—*Case at bar.*—Prisoner asked the court to instruct that "if the jury believe from the evidence that the prisoner did not begin the fight; or, having begun it, endeavored to decline it, and killed the deceased to save himself from serious bodily harm; or to avoid his own destruction, they must acquit the prisoner." The court amended so as declare "that the prisoner must not only have declined further combat, but must have done all he could with safety to himself," and gave the instruction as amended. *Held*, error, because, as amended, it was too vague and indefinite.

5. IDEM—*Malice aforethought—Passion.*—Instruction that "if the jury believe the accused killed the deceased with malice aforethought, but in sudden transport of passion, or heat of blood, on provocation by deceased, they must find accused guilty of murder in the second degree," is erro-

neous, because act proceeding from the one cannot proceed from the other.

6. IDEM—*Jury—Law and fact.*—In criminal cases the jury are not the judges of the law.

Error to judgment of the judge of the circuit court of Stafford county, rendered March 29, 1889, refusing a writ of error to a judgment of the county court of said county, rendered February, 1889, sentencing Henry Brown, the plaintiff in error, in accordance with the verdict of the jury, to imprisonment in the penitentiary for the period of fifteen years for the murder of J. B. Heflin. Opinion states the case.

*J. S. Mason,* for the plaintiff in error.

*Attorney-General R. A. Ayers,* for the commonwealth.

LEWIS, P., delivered the opinion of the court.

The prisoner was indicted in the county court of Stafford county for the murder of J. B. Heflin, and at a subsequent term he was put upon his trial, found guilty of murder in the second degree, and sentenced, in accordance with the verdict, to confinement in the penitentiary for a term of fifteen years.

1. To the indictment there was a demurrer, which was based upon two grounds. The first was that the deceased was designated in the indictment by initials of his name merely; and the second was that the indictment lacked the requisite constitutional conclusion. The indictment concludes, "against the peace and dignity of the commonwealth *of Virginia,*" the last two words being in addition to the required form prescribed by the constitution. The demurrer, however, was overruled, and in this there was no error. The designation of the name of the deceased was sufficient. Whart. Crim. Pl. and Pr., (8th ed.,) sec. 117. And the mere statement of the

objection to the conclusion of the indictment is a sufficient answer to it.

2. There was also a motion to quash the indictment, because it was not signed by the attorney for the commonwealth; but the motion was overruled, and rightly so. Whatever the practice may be, it is not required at common law that the indictment be signed by the prosecuting officer, and there is no statute requiring it in Virginia. If such signature were essential to the validity of an indictment, the grand jury would be completely under the control of the prosecuting attorney.

3. The next objection is, that it does not appear from the record that the jury were duly sworn. The record recites that the jury " were sworn the truth of and upon the premises to speak," and this is sufficient, the presumption being that the oath was in due form. 1 Bish. Crim. Proc. (3d ed.), sec. 1357; Rob. Forms, 232.

4. After the evidence on both sides had been closed, the prisoner moved the court to give the jury a number of instructions, of which the first was as follows: " The court instructs the jury that if they believe from the evidence that Heflin, or Heflin with others, did any act or that there were circumstances brought about by them of such a character as to afford the accused a reasonable ground for believing that the said Heflin, or he in conjunction with others, designed to kill him, the said Henry Brown, or to inflict on him great bodily harm, and there was imminent danger of carrying such design into immediate execution, then, under these circumstances, the killing is excusable, although it may have turned out afterwards that the appearances were deceptive, and there was no design on the part of Heflin to kill the accused or to do him great personal injury, and the jury must acquit the accused."

The court, however, refused to give the instruction as asked for, but amended it so as to make it declare, in effect, that the killing was excusable only " if *necessary* to preserve the prison-

er's life or his person from great bodily harm," and as amended, the instruction was given.

The instruction ought to have been given as offered. In *Stoneman's case*, 25 Gratt., 887, it was decided, after careful consideration, that although the bare fear that a man intends to commit a murder or other atrocious felony, however well grounded, unaccompanied by any overt act indicative of any such intention, will not warrant killing the party by way of prevention, yet if there be an overt act indicative of immediate danger at the time—that is to say, an act indicating a present intention to kill the party or to do him some great bodily injury, the killing will be justifiable, although it should afterwards turn out that appearances were deceptive, and that there was in fact no design to commit a felony or to do great personal injury. The law, said the court, does not require that there should be actual danger to justify the killing. If the act done, or the circumstances existing, be of such a character as to afford reasonable ground for believing that there is a design to commit a felony, or do some serious bodily harm, and that there is imminent danger of such design being carried into immediate execution, that is sufficient.

The amended instruction is not in accordance with this doctrine, and ought not to have been given. The original instruction, however, does correctly propound the law, and ought to have been given.

5. The next question relates to the action of the court with respect to the second instruction offered by the prisoner. The instruction as offered is as follows: " If the jury believe from the evidence that the prisoner, Henry Brown, did not begin the fight, or having begun it, endeavored to decline it, and killed Heflin to save himself from serious bodily harm, or to avoid his own destruction, they must acquit the prisoner." This instruction the court amended so as to make it declare that the prisoner must not only have declined further combat,

but that he " did *all* as far as he could with safety to himself," etc., and as thus amended, the instruction was given.

The law on this subject is that he who, in the case of a mutual conflict, would excuse himself upon the foot of self-defence, must show that before the mortal stroke was given, he had declined any farther combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity in order to avoid immediate death or great bodily harm. A party, however, is not bound in every instance of an assault to flee from his assailant, for the assault may be so fierce and violent as not to allow him to yield a step without manifest danger of life or great bodily harm, and then in defence he may kill his assailant instantly. But it is to be observed, with regard to the nature of the necessity, that the party killing cannot, in any case, substantiate his excuse, if he kill his adversary even after a retreat, unless there were reasonable ground to apprehend that he would otherwise have been killed himself or have suffered great bodily harm.

Tested by this rule, the instruction as offered is more favorable to the prisoner than the law warrants; and the amendment put upon it by the court renders it altogether too vague and indefinite. The phrase in the amendment, " did *all* that he could," was not only too general, but was calculated to confuse and mislead the jury. The law ought to have been stated with more precision; and our opinion, therefore, is that neither the original nor the amended instruction ought to have been given.

6. The prisoner also moved the court to instruct the jury that they were the judges of the law as well as the facts, but the court refused to give the instruction, and the prisoner excepted.

We think the instruction was rightly refused. Although authorities may be found in support of the doctrine contended for by the prisoner (for at one time it was a popular one), it is

not founded in principle. There is no doubt that in criminal cases the jury have *the power* to find a verdict of acquittal in direct opposition to the opinion of the court upon the law, and their verdict will be forever binding. But this is not because they have *the right.* to judge of the law in opposition to the opinion of the court, but because the law in its humanity does not permit a person charged with crime to be twice tried for the same offence, or rather does not permit a verdict of acquittal in a criminal case to be set aside. Hence, if the power to find a verdict of acquittal in a criminal case is improperly exercised, the error is, in general, irremediable. In other words, the jury have the physical power to disregard the law as laid down by the court, but not the moral right to do so. It is, indeed, a maxim of the law, almost coeval with the institution of juries, that it is the office of the judge to respond as to the law, and the jury as to the facts, and few rules are more essential in the administration of justice.

Lord Mansfield in a case before him declared that the doctrine that the jury were the judges of the law, was contrary not only to the fundamental principles constituting trials by jury, but to reason and fitness, and that he was glad he was not bound to subscribe to such an absurdity. And to the same effect is the great preponderance of judicial authority in this country at the present day.

In *Davenport's case*, 1 Leigh, 588, the decision, while not fully to the point, goes very far in that direction, it not being necessary to the decision of the case that the court should go further. In that case the precise point decided was, that if the prisoner's counsel, in a criminal case, asks the opinion of the court and an instruction to the jury on a point of law, and the court rules the point against the prisoner, his counsel will not be allowed to controvert the correctness of that ruling before the jury; and the same principles was decided in *Dejarnette's case*, 75 Va., 867; which could hardly be a sound doctrine if the jury are the judges of the law; for if they are, it is diffi-

cult to see how their right to judge of the law in the particular case can be affected by the circumstance that instructions were asked from the court. If they are the judges of the law they may disregard the instructions of the court, and if they have the legal right to do so, it is equally the right of the prisoner's counsel to address them on the law of the case, without regard to the instructions of the court, or the fact that instructions were asked for by the prisoner.

*Garth's case*, 3 Leigh, 761, decided nothing, as the case was dismissed for want of jurisdiction.

It is true that in *Doss' case*, 1 Gratt., 557, it is stated, in general terms, and in a single line, that the jury in a criminal case are the judges of the law ; but no reference is made to any authority on the subject, and the expression, which seems to have crept into the opinion of the judge who spoke for the court, rather than to have been deliberately put there, was not necessary to the decision of the case. All that was decided was that in a criminal case neither the attorney for the commonwealth nor the accused can be compelled to join in a demurrer to the evidence, and this none will deny.

In *Honesty's case*, 81 Va., 283, the question we are considering was neither discussed nor decided.

The idea that the jury are the judges of the law in any case, was very strongly combatted by Mr. Justice Story, in *United States* v. *Battiste*, 2 Sumn., 240, who said : " My opinion is that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and fact, and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But I deny that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions or pleasure. On the contrary, it is

the duty of the court to instruct the jury as to the law, and it is the duty of the jury to follow the law, as it is laid down by the court. * * "If I thought," he added, "that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial." See also *Muscoe's case* (decided at present term) *ante*, p. 443; 1 Greenl. Evid. (14th ed.), sec. 49, and cases cited in the note.

These views seem to us to be eminently sound and proper, and they are decisive of the question raised in the present case on the same subject.

7. The only remaining question necessary to be considered, relates to the action of the court in giving to the jury the following instruction at the instance of the commonwealth : "The court instructs the jury that if they believe the accused killed J. B. Heflin with malice aforethought, but in sudden transport of passion, or heat of blood, on provocation given by said Heflin, they must find the accused guilty of murder in the second degree."

This instruction also is erroneous. To speak of a homicide as having been committed with malice aforethought, and in sudden passion upon reasonable provocation, is a legal solecism. "Malice aforethought" implies a mind under the sway of reason, whereas "passion," whilst it does not imply a dethronement of reason, yet is the *furor brevis*, which renders a man deaf to the voice of reason; so that, although the act done was intentional of death, it was not the result of malignity of heart, but imputable to human infirmity. Passion and malice are, therefore, inconsistent motive powers, and hence an act which proceeds from the one, cannot also proceed from the other.

As was said by Gaston, J., speaking of the court, in *Slater* v. *Johnson*, 1 Ired., 354 : " There can be no such thing in law as a killing with malice, and also upon the *furor brevis* of passion ; and provocation furnishes no extenuation, unless it produces

·passion. Malice excludes passion. Passion pre-supposes the absence of malice. In law they cannot co-exist." Therefore, if an act of killing, prompted by malice, would be murder, it is only manslaughter when it springs from passion. 2 Bish. Crim. Law. (7th ed.), sec. 697; *Preston* v. *State*, 25 Miss., .383; *Murphy* v. *State*, 31 Ind., 511; *Stokes* v. *State*, 18 Ga., 17; *Commonwealth* v. *Witter*, 2 Brews., 388; *People* v. *Milgate*, 5 Cal., 127; *State* v. *Johnson*, 3 Jones, (N. C.), 266.

The instruction confounds these elementary principles of criminal law, and the necessary result was to confuse and mislead the jury. And as on account of the misdirection of the court, the case must go back for a new trial, the question as to whether or not the verdict was warranted by the evidence, is a question not necessary or proper to be considered.

JUDGMENT REVERSED.