# CHARLESTON.

## STATE v. ED COOK.

Submitted February 12, 1918. Decided February 26, 1918.

1. CRIMINAL LAW—*Illegal Constitution of Grand Jury—Plea in Abatement.*

    The appropriate way to put in issue the validity of an indictment because of the improper constitution of the grand jury which found the same is by plea and abatement. (p. 689). ·

2. SAME—*Motion to Quash—Construction as Plea in Abatement.*

    A paper filed in a criminal case in time for a plea in abatement, containing the allegations necessary to raise the question of the validity of an indictment because of the improper constitution of the grand jury, and properly verified, will be treated as a plea in abatement, notwithstanding the pleader designates it a motion to quash. (p. 689).

3. CONSTITUTIONAL LAW—*Equal Protection of the Laws—Jury Service—Persons of African Race.*

    Whenever by any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because

of their race or color, from serving as grand or petit jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him contrary to the fourteenth amendment to the Constitution of the United States.  (p. 690).

4. SAME—*Equal Protection of the Laws—Jury Service—Exclusion of Persons of African Descent.*

The fact that there were no persons of African descent upon the grand jury finding such indictment, or upon the petit jury summoned for the purpose of trying the defendant, does not of itself show the exclusion of such persons solely because of race or color. (p. 690).

5. SAME—*Indictment and Information—Equal Protection of the Laws—Right of Person of African Descent—Mixed Jury.*

A person of African descent accused of crime cannot of right demand a mixed jury, some of which will be of his race, nor is a jury of that kind guaranteed by the fourteenth amendment to any race.  (p. 690).

6. JURY—*Constitution of Grand Jury and of Petit Jury—Pleading and Proof.*

The allegations contained in a pleading challenging the proper constitution of a grand jury because persons of African descent are excluded therefrom solely for that reason, and of a motion to quash the petit jury summoned for the trial of a person of African descent charged with crime for the same reason, must be supported by affirmative evidence. The allegations of the plea and of the motion are not evidence of these facts.  (p. 690).

7. CONSTITUTIONAL LAW—*Equal Protection of the Laws—Jury Service—Exclusion of Person of African Descent.*

Proof that there are some persons of African descent qualified for jury service without showing the number thereof, or the proportion such qualified persons bear to the number of qualified persons of other races, together with the evidence of those charged with the selection of the jurors that no person of African descent was drawn thereon, but that in making such selection the exclusion did not result from any intention or motive to exclude such persons, but was simply the result of their selection of the persons whom they thought to be most competent for the service, does not show that such persons of African descent were excluded from jury service solely because of their race or color.  (p. 690).

8. CRIMINAL LAW—*Appeal—Verdict—Reversal.*

The verdict of a jury in a criminal case based upon conflicting oral evidence will not be reversed on writ of error to this court, unless the evidence so strongly preponderates in favor of the defendant as to clearly indicate that the jury was influenced by passion, prejudice, or other improper motive in arriving at such verdict.  (p. 692)          81 W. Va.

9.  SAME—*Acts and Declarations—Effect.*
    ·  Acts and declarations of one of several persons who have com-
    bined to commit a crime, if done or made in furtherance of the
    common design, are, in contemplation of the law, the acts and
    declarations of all.  (p. 692).

10. HOMICIDE—*Principals—Conspirators.*
    If persons combine together for the purpose of rescuing a per-
    son in the custody of officers of the law, and in the execution of
    such design a murder is committed, all are equally principals in
    the murder.  (p. 692).

11. SAME—*Killing by Mob—Evidence—Arms.*
    Where a murder has been committed by a mob in the execution
    of its design to rescue a person in the hands of officers, it is
    competent to introduce to the jury, upon the trial of a member of
    such mob, a shot gun found upon the ground on the morning
    after the murder which it is shown was used by some member of
    the mob, even though it appears that the officer who was killed
    died as the result of a wound received from another weapon.  The
    jury was entitled to be informed that the mob was armed at the
    time of the attack, and the character of the weapons possessed by
    the mob.  (p. 692).

12. CRIMINAL LAW—*Instructions—Request.*
    It is not error to refuse an instruction when the jury has been
    already sufficiently and correctly instructed on the point covered
    thereby.  (p. 695).

Error to Circuit Court, Raleigh County.

Ed Cook was convicted of murder in the first degree, and
from a judgment of the circuit court for Raleigh county, re-
fusing to grant him a writ of error to a judgment of the
criminal court of the county, he brings error.

*Affirmed.*

*J. M. Ellis, Brown W. Payne* and *John M. Anderson,* for
plaintiff in error.

*E. T. England,* Attorney General, *Chas. Ritchie,* Assistant
Attorney General, and *J. Q. Hutchinson, Geo. W. Williams*
and *Ashton File,* for the State.

RITZ, JUDGE:

From a judgment of the circuit court of Raleigh county
refusing to grant to him a writ of error to a judgment of the

criminal court of said county convicting him of murder in the first degree, and sentencing him to imprisonment for life, the defendant prosecutes this writ of error.

The first question presented is, whether or not the trial court erred in refusing to quash the indictment, and in refusing to quash the panel of petit jurors summoned to try the defendant, upon the ground that colored men were excluded from the grand jury which found the indictment, and from the petit jury which tried the defendant, he being a colored man. Before the defendant plead to the indictment herein he tendered what is called a motion to quash the indictment, the grounds of which motion are that he, being a colored man, was deprived of the equal protection of the law in that men of his race were excluded from service upon the grand jury which found the indictment, solely because of their race and color; that there were a large number of such men fit for such service in the county, but that none were drawn, and that the names of none of such were placed in the jury box, and that the reason of this failure was because they were colored men. The appropriate way to attack an indictment because of the unlawful constitution of the grand jury which found it is by plea in abatement, and not by motion to quash. *Commonwealth* v. *Cherry*, 2 Va. Cases 20; *Commonwealth* v. *Long*, 2 Va. Cases 318; *Kerby* v. *Commonwealth*, 7 Leigh 747; *Moore* v. *Commonwealth*, 9 Leigh 639; *Booth* v. *The Commonwealth*, 16 Gratt. 519; *Taylor* v. *Commonwealth*, 90 Va. 109; *McCue* v. *Commonwealth*, 103 Va. 870; *State* v. *Clark*, 64 W. Va. 625. However, the paper filed by the defendant, which he called a motion to quash the indictment, was filed in the proper time for a plea in abatement. It contains all the allegations necessary for such a plea in order to raise the question sought to be raised by the defendant, and it was verified in the manner required for the verification of such pleas. This being true, the court below very properly disregarded the name which the pleader gave to his paper and treated it as a plea in abatement. *Nicely* v. *Butcher*, 81 W. Va. 247, 94 S. E. 147. The allegations of the plea were put in issue by the state, and after the court heard the evidence thereon he found that the same had not been sus-

tained, and refused to quash the indictment. The defendant thereupon filed a motion to quash the panel of petit jurors for the same reason set up in his plea to the indictment, and the court after hearing the evidence upon this motion found that the allegations thereof were not sustained and refused to quash such panel of petit jurors.

It is very well settled that a colored person charged with crime is denied the equal protection of the laws if persons of his race are excluded from service upon the grand jury making the indictment against him, or the petit jury before whom he is placed upon trial, solely because of their race or color. 12 Corp. Jur. 1173; *Strauder* v. *West Virginia,* 100 U. S. 303; *Neal* v. *Delaware,* 103 U. S. 370. And it makes no difference whether such exclusion because of race and color is effected by a statute, or by the arbitrary and wrongful acts of the officers in the administration of the law. *Gibson* v. *Mississippi,* 162 U. S. 565; *Tarrance* v. *Florida,* 188 U. S. 519; *Carter* v. *Texas,* 177 U. S. 442; *Martin* v. *Texas,* 200 U. S. 316. It is not contended in this case that there is anything in the statute law of the State of West Virginia which, when properly administered, would have the effect to exclude persons from jury service because of race or color, but the whole contention is that the officers of Raleigh county charged with the execution of the law in this regard so administered it as to bring about that result. This involves then a question of fact. It has been repeatedly held by the Supreme Court of the United States that where it is sought to quash an indictment, or to discharge a petit jury, because of the exclusion of colored persons therefrom, upon the ground of the improper and unlawful administration of the law by the executive or administrative officers, he who seeks such action must affirmatively prove that such persons are excluded solely because of their race or color. *Martin* v. *Texas,* 200 U. S. 316; *Brownfield* v. *South Carolina,* 189 U. S. 426; *Tarrance* v. *Florida,* 188 U. S. 519. It is contended that the case of *Neal* v. *Delaware* holds that the plea verified by affidavit is sufficient evidence of the facts contained therein. An examination of that case will disclose the fact that while the court held the allegations of the plea to be evidence of the contents

thereof, it was because of an agreement of the attorney general to that effect. The subsequent cases above referred to distinctly and clearly hold that the allegations of the plea will not be considered as evidence, and unless those allegations are made out by affirmative evidence introduced upon the trial of the issue raised upon the plea the same must fail. Did the evidence offered upon this plea in abatement and upon the motion to quash the petit jury panel establish the facts alleged? The testimony in this regard is that about one-third of the population of Raleigh county is of the Negro race. The county clerk testifies that he knows some colored persons who are as well qualified for jury service as some of the white people who sit, and counsel for the defendant being examined as a witness testifies that there are some colored persons in Raleigh county possessing the qualifications requisite for grand jury service. How many, he does not say; what proportion of the adult male population possess these qualifications, he does not indicate; and while he does say that about one-third of the total population is of the Negro race, this is not evidence that one-third of the persons qualified for grand jury service are of that race. It is also shown that there are colored persons qualified for petit jury service, but how many does not appear. Two commissioners charged with the drawing of the petit jury were introduced as witnesses. They both testify that so far as they know the names of no colored persons were placed in the jury box, but they further testify that in filling the jury box, and in drawing the jurors, they never considered the question of race or color; that they were moved only by the desire to select men qualified for the service; that in doing this they relied largely upon their acquaintance with the people of the county, and upon the personal property books; that when they resorted to the personal property books to secure names to place in the jury box they did so without regard to whether or not the persons so selected were white or colored; in fact they both say that this question was never considered or thought of by them. It is also shown that there were no colored persons on the grand jury which made the indictment against the defendant, nor were there any colored persons upon the petit jury which

tried him. This fact of itself is not sufficient. The defendant did not have a constitutional right to a mixed jury, such right extending no further than to guarantee to him that the laws under which the jurors were drawn would not exclude men of his race. *Martin* v. *Texas,* 200 U. S. 316. In a number of the cases above cited in which this question was considered by the Supreme Court of the United States the judgments of the lower courts were reversed because they arbitrarily refused to allow a plea to be filed raising the question. In others the judgments of the lower courts were affirmed because there was no evidence introduced to sustain the plea. In the case of *Murray* v. *Louisiana,* 163 U. S. 101, evidence was offered upon the plea. It was shown in that case by the evidence the comparative population of white and colored, the number of whites qualified for jury service, and the number of colored qualified therefor, these figures indicating that more than one-third of the persons qualified for jury service were of the colored race. It was also shown that occasionally the name of a colored man was placed in the jury wheel, but that no colored man was drawn for jury service. The jury commissioners testify that they selected the names with reference to their qualifications as jurors, without regard to color, and that there was no discrimination upon that account. It was held that these facts did not sustain the plea, and the judgment of the lower court refusing to quash the indictment was sustained. The evidence in that case went very much further than the evidence in the case we have before us, as will be observed by a reading of the case. In the case at bar the judge of the court below gave full opportunity to the defendant to offer all the evidence he desired upon this question, and it appears that he came to his conclusion that the plea was not sustained only after due and careful consideration. We find no error in the judgment refusing to quash the indictment for the reason that persons of the African race were excluded from the grand jury because of their race or color, and refusing to quash the petit jury panel for the same reason.

The action of the court below in the admission of certain evidence, in the refusal of a certain instruction, and in over-

ruling the motion to set aside the verdict of the jury because contrary to the law and the evidence is also assigned as error.

On the 6th day of June, 1916, at a primary election being held at Winding Gulf precinct in Raleigh county a difficulty arose between a colored man by the name of McClenan and a white man by the name of Altie Cook, which resulted in McClenan striking Cook over the head with the limb of a tree fracturing his skull. McClenan attempted to escape but was pursued by officers, overtaken, and arrested. Another colored man interfered with the officers in making the arrest and he was likewise arrested for his interference. These two colored men were taken to Winding Gulf and confined in a small building used at that place as a temporary jail. It appears that there was considerable talk of lynching the colored man McClenan because of the attack made by him on Cook, and for this reason the officers having him in charge kept him very carefully guarded during the afternoon and evening of that day, and likewise telephoned to the county seat to a justice of the peace to come and take charge of the prisoners. There is a considerable colored population in and around Winding Gulf and this talk of lynching came to the knowledge of the colored people. Late in the evening they gathered in considerable groups around the place where McClenan was confined, and determined to rescue him. One of the colored men who seems to have been in the confidence of the officers was directed to communicate to the mob that there would be no lynching, that the prisoners would be protected and taken to the Beckley jail, and to request the mob to disperse. Upon this communication being made this man testifies that some member of the mob replied, "hell with the officers! We are Odd Fellows from Hot Coal, come up for them." It seems that about this time one of the deputy sheriffs discovered that some of the mob were armed, and he and two of his companions stepped out of the house where the prisoners were confined and directed all the members of the mob who had weapons to lay them down. Thereupon the mob immediately opened fire upon these three officers killing one of them instantly and severely wounding the other two. The prisoners confined in the house were rescued and the

mob thereupon dispersed. It is shown that when the mob fired upon the three officers some of them returned the fire, but they were almost instantly overcome by the excessive force of the mob. Some of the witnesses say that there were from one hundred to three hundred shots fired almost simultaneously. The defendant was indicted charged with the murder of the deputy sheriff who was killed. It is not contended that the evidence shows that the defendant actually fired the shot which killed this man, but it is contended that he was one of the mob who came there for the purpose of rescuing the prisoners. His defense is that he was not present at the time, but was three or four miles away. It is shown that the attack made by the mob was between twelve and one o'clock on the morning of June 7th. Two witnesses testify that they saw the defendant in the front ranks of the mob on the occasion of the shooting. Another witness testifies that a short time before the shooting he saw the defendant and a number of other colored men a short distance away from the place of the shooting, going in that direction. Some eight or ten colored men testify that Cook was not at the place of the shooting, but was at Hot Coal about three and one-half miles distant therefrom, at a meeting of the Odd Fellows lodge at that place. They testify that Cook was present at the opening of the lodge at about eight o'clock on the evening of the 6th ,and that the lodge continued in session until nearly one o'clock on the morning of the 7th, and that Cook did not leave during all of that time. The witnesses for both the state and the defense are contradicted in many ways, and the evidence is highly conflicting upon the point as to whether or not Cook was actually one of the mob who rescued the prisoners from the deputy sheriffs. It is earnestly contended by the defendant that the evidence clearly preponderates in his favor upon that question, and that the jury's verdict should be set aside for that reason. It is true a larger number of witnesses testify that Cook was at another place than testify that he was present at the place of the shooting, but this fact is not conclusive upon the jury. It was the province of the jury to consider not only the oral testimony given by the witnesses, but all the other circumstances surrounding the giving of the

same, and surrounding the witnesses at the time of the trans-
action. We think the question involved here was one peculiar-
ly for jury determination.

The action of the court in permitting one of the witnesses.
to testify to the declaration made by some member of the mob
to the effect that they were Odd Fellows from Hot Coal and
had come up to take the prisoners is assigned as error. If this
statement was made, and that it was is not denied, it was
made immediately before the shooting which resulted in the
death of one of. the officers and the serious wounding of the
other two, and the rescue of their prisoners. It was a part
of the particular transaction in which the mob was engaged..
It is quite clear from the evidence that there was a con-
spiracy to rescue the two colored men in charge of the of-
ficers, and any statement or declaration made by one of the
conspirators in furtherance of the design declaratory of their
purpose and intent is part of it. *Spies* v. *People,* 122 Ill 1,
3 Am. St. Rep. 320; Jones on Evidence, § 344; Wigmore on
Evidence, § 1790. In the trial of Lord George Gordon for-
treason before Lord Mansfield, recorded in 21 Howell St.
Trials, page 485, evidence was admitted to prove declarations.
of a mob addressed by Lord Gordon as to their intentions and
purposes, and this was held to be entirely proper as tending
to show that the intentions of the defendant were treasonable.

The action of the court in permitting the state to in-
troduce in evidence before the jury a shot gun found upon
the ground the morning after the shooting is also complained
of. We think there was no error in this. While it is true the
evidence shows without contradiction that the mob was armed,.
still this gun left by one of the mob upon the ground was
corroborative of this fact, and the state was entitled to intro-
duce to the jury all of the evidence it had proving, or tending
to prove, that the mob was armed, and the character of such
arms. The fact that the men constituting the mob were
armed would indicate their purpose and intention in coming
there, and introducing this gun to the jury was indicative of
the general character of the weapons in the hands of the mob.

The action of the court in refusing to give to the jury in-
struction No. four asked for by the defendant is also assigned

as error. This instruction in effect told the jury that if they had any reasonable doubt that the defendant committed the offense, or aided and abetted in its commission, he should be found not guilty. It might be said that this instruction presents propositions of law applicable to this case, and should have been given unless it had been fully covered by the instructions already given. It must be borne in mind in considering this assignment that all of the defendant's testimony fixed his presence at the Odd Fellow's lodge room in Hot Coal at the time of the shooting, and the jury were very carefully instructed by the court in instructions given on motion of the defendant that if they had a reasonable doubt of the defendant's guilt they must acquit him. They were also instructed that he was presumed to be innocent, and that the state must prove every essential element necessary to constitute the crime beyond all reasonable doubt. Of course the presence of the prisoner and his participation with the mob were essential elements of the crime under the evidence. The court further instructed the jury in a particular instruction that if they believed that the defendant was at the lodge room at Hot Coal at the time of the commission of the crime, then they must acquit him. The issue in this case was so clearly defined that the jury could scarcely be misled, even though no instructions were given, but when we consider that the court did very carefully instruct the jury that the state was required to prove all the elements necessary to make the crime beyond all reasonable doubt, and that if the prisoner was at Hot Coal he could not be guilty of the offense, we are of opinion that to give this instruction would be simply to repeat in effect instructions already given, and as has been repeatedly held it is not error to refuse to give an instruction when the jury has been already sufficiently and correctly instructed on the point covered thereby. *State* v. *Dillard,* 59 W. Va. 197; *Harman* v. *Maddy Brothers,* 57 W. Va. 66; *Normile* v. *Wheeling Traction Co.,* 57 W. Va. 132.

Our conclusion is that there is no error in the judgment complained of, and the same is affirmed.

*Affirmed.*